SWEDESBORO LOAN AND BUILDING ASSOCIATION

*v.*

JAMES GANS et al.

[Filed June 5th, 1903.]

1. In the case stated no consideration was paid for the cancellation of the mortgage.—*Held*, that, as against the heirs of the mortgagor, complainant was entitled to a decree for the re-establishment and foreclosure of the mortgage.

2. Cases of plain mistake or misapprehension of right, though not the effect of fraud or contrivance, are entitled to the interposition of a court of equity where there has been no negligence on the part of the applicant.

*Mr. Norman Grey* and *Mr. Wilfred B. Wolcott,* for the complainant.

*Mr. Thomas E. French* and *Mr. Samuel Richards,* for the defendants.

REED, V. C.

This suit is brought to have a mortgage which has been cancelled upon the record re-established and foreclosed. The facts, as I gather them from the pleadings, from the meagre testimony and from the position taken by counsel, are as follows: One Charles Gans, of Gloucester county, made a mortgage, dated March 11th, 1892, to the Swedesboro Loan and Building Association to secure the sum of $1,100, payable in one year. Charles Gans, the mortgagor, died June 9th, 1894, intestate, leaving him surviving his widow, Kate P. Gans, and as his heirs, two brothers—James and John—and three sisters—Jennie, Phebe and Mary.

On April 1st, 1895, the widow released to the complainants her right of dower in the mortgaged premises. The complainant accepted a deed from one Sebastian Gans, the father of

Charles, the deceased mortgagor, under the belief that on the death of Charles the property descended to his father. After the execution of this deed, the loan and building association, believing that it held the legal title to the premises, on August 5th, 1895, cancelled its mortgage. The procuration of the deed from Sebastian Gans seems to have been accomplished by one Benjamin McAllister, who was a scrivener and was at one time a director of the building association and did writing for them, and who seems also to have been mixed up in the settlement of the estate of Charles Gans. He apparently acted as intermediary between the building association and the Gans', and got the deed which the complainant accepted upon his word as a conveyance of the equity of redemption in the mortgaged premises. Upon the execution of this deed the complainant went into possession, and has since received the rents and profits therefrom. There can be no doubt that the cancellation of the mortgage was induced by the belief that by force of the deed of Sebastian Gans the land association owned a complete title to the property.

It is thus manifest that the equity of the situation is entirely with the complainant. The defendants, as heirs of Charles Gans, received the property subject to the lien of this mortgage. The cancellation of the mortgage was a pure gift to the defendants of the mortgagee's interest in the property. The heirs had not paid one cent to bring about this change in the respective position of mortgagee and heirs.

Neither has any purchaser, *bona fide* or otherwise, come into existence upon the faith of the cancellation of the mortgage.

It is clear, therefore, that unless some inexorable rule compels otherwise, the complainant should be relieved from the predicament into which it was misled by its belief in its ownership of a complete title to the mortgaged property.

The substantial ground upon which the heirs resist the granting of this relief is that while the cancellation was caused by a mistake of the complainant, it was a mistake of law and not of fact. The maxim *juris ignorantia non excusat* is invoked by the defendants. This maxim is subject to so many exceptions that it is quite as often inapplicable as applicable to supposed mistakes of law.

That the present case, involving the release of private rights under a mistaken notion as to private ownership of property, is one in which the English courts of chancery would afford prompt relief cannot be doubted.  The line of cases granting relief where a man purchased his own property through mistake (*Bingham* v. *Bingham, 1 Ves. Sr. 127*), or where a release was made so broad in its terms as to release rights of property of which the party was ignorant (*Chalmondeley* v. *Clinton, 2 Mer. 171*), or where a party, under the misapprehension that he had no title, surrendered to the supposed owner (*Pusey* v. *Desbouvrie, 3 P. Wms. 315*), exhibit the degree in which courts of equity granted relief from such mistakes.  In *Livesey* v. *Livesey, 3 Russ. 287,* an executrix, who, under a mistaken construction of a will, had overpaid an annuity, was permitted to deduct the amount overpaid from subsequent payments.  In *McCarthy* v. *Decaix, 2 Russ. & M. 614,* a person was relieved where he had renounced a claim of property made under a mistake respecting the validity of a marriage, the lord-chancellor saying: "What he has done was in ignorance of the law, possibly of fact; but in a case of this kind this would be one and the same thing."

In *Cooper* v. *Phibbs, L. R. 2 H. L. 149, 172; S. C., 22 Eng. Rul. Cas. 870,* an agreement was cancelled because it had been entered into through a mistake as to the ownership of a fishery.  In this case Lord Westbury expressed the much-discussed sentiment that the word *"jus"* in the maxim is used to denote a general law, and has no application to private rights.  The result of this decision of the house of lords was that an act caused through a mistake as to ownership of property would be remedied in equity. In *Beauchamp* v. *Winn, L. R. 6 H. L. 223, 264; S. C., 22·Eng. Rul. Cas. 889,* a mutual mistake in an agreement as to the rights of the·parties resulted in a correction of the agreement.

The result of the English cases is summed up by Mr. Kerr in the remark "that if a man through misapprehension or mistake of the law parts with or gives up private rights to property, or assumes obligations upon grounds upon which he would not have acted but for such misapprehension, a court of equity may grant relief, if under the general consideration of the case it is

satisfied that the party benefited by the mistake cannot in con-
science retain the benefit or advantage so acquired." *Kerr Fr.*
This statement of the equitable rule was cited with apparent
, approval by Chancellor Runyon in *Macknet* v. *Macknet, 2 Stew.
Eq. 54, 59,* and in *Martin* v. *New York, Susquehanna and West-
ern Railroad Co., 9 Stew. Eq. 109, 112.*

The equity cases in this country, more particularly the earlier
cases, exhibit a less liberal spirit in granting relief for mistakes
in law. This resulted mainly, I think, from the great influence
which the early reported cases decided by Chancellor Kent had
in shaping the early equity jurisprudence of this country.

The case of *Lyon* v. *Richmond, 2 Johns. Ch. 60,* was an ap-
plication to set aside an agreement, because it was entered into
under the influence of a supposed condition of the law, and
afterwards the court of errors rendered a decision which changed
the law as it was supposed to exist when the agreement was made.
In deciding that the court could grant no relief, Chancellor Kent,
having in mind, of course, the particular facts of that case, made
some general remarks in respect to the impolicy of a court of
equity attempting to relieve against mistakes of law. These re-
marks appear again and again in the earlier cases, being used
as a general authority against the granting of relief in all cases
of mistakes of law.

These remarks appear in the opinion in the case of *Garwood*
v. *Administrator of Eldridge, 1 Gr. Ch. 145,* which case is in-
voked as conclusive against the restoration of this mortgage.
In that case Chancellor Pennington declined to re-establish
certain mortgages which had been cancelled by a mortgagee who
purchased the equity of redemption, and by the cancellation, a
judgment, of the existence of which the mortgagee was ignorant,
became a superior lien upon the property. The chancellor stated
the rule to be that relief would not be granted to the complain-
ant if his mistake was as to the legal effects of the cancellation
in advancing the lien of the judgment. The remarks of the
chancellor were uncalled for, because he found that there was
no mistake at law at all. The mistake was in the mortgagee's
failure to search the record, the result of his negligence being

that he was unaware of the existence of the judgment. His mistake was one of fact, and the negligence of the complainant was the real ground for his defeat.

This case and *Lyon* v. *Richmond, supra,* is cited in the case of *Bentley* v. *Whittemore, 3 C. E. Gr. 366, 374,* in which case Chancellor Zabriskie stated that certain mortgages which had been cancelled upon the faith of an assignment, which assignment he held to be void, could not be restored because the cancellation was induced by a mistake at law. This case was reversed (*S. C., 4 C. E. Gr. 402*), the court of appeals holding that the assignment was valid. The assignment, therefore, being valid, the question of the establishment of the cancelled mortgages was eliminated from the case, and the chancellor's remarks became *dicta.*

The remarks of Chancellor Kent appear in *Executors of Wintermute* v. *Executors of Snyder, 2 Gr. Ch. 489,* where there was an assignment of the interest of certain parties under a will, and their ignorance of their rights under that instrument misled them to the execution of the assignment. Chancellor Vroom refused to grant relief, upon the ground that the mistake was one of law. The learned chancellor, however, was careful to exclude the inference that in his judgment there could be no instance where equity could relieve against mistakes of law. The case itself holds that this dispositive instrument, the execution of which had been induced by mistake of law, would not be rectified. This was the doctrine announced by Chancellor Runyon in *Hampton* v. *Nicholson, 8 C. E. Gr. 423.* The chancellor said that where a purchaser accepts a deed by which no title is conveyed when there is no misapprehension as to the facts and no fraud and no warranty of title, he has no redress at law or in equity.

But in that case a mortgage had been cancelled and the chancellor proceeded to remark: "If the mortgage had been cancelled without actual payment on the mistaken supposition that the deed merged and satisfied it, and the debt of $300 due from the testator to the complainant had been given up and discharged on the belief that it was satisfied by the amount due for the

conveyance, this cancelling and satisfaction being entirely without consideration, could in equity be set aside and the debts be declared to be subsisting."

In *Skillman* v. *Teeple, Sax. 232,* the holder of notes released a mortgagee from his liability upon the notes under a misapprehension as to her legal rights at the time. Drake, master, said: "In this case there can be no doubt that the complainant and Teeple acted under a mistake or misapprehension of her rights. Under such a mistake she signed a parol agreement without any consideration and highly prejudicial to her interests. I am of the opinion that the agreement should be set aside."

Our later cases display a desire to discover some ground to rectify an inequitable result flowing from mistakes of all kinds. *Chilver* v. *Weston, 12 C. E. Gr. 435; Macknet* v. *Macknet, supra; Martin* v. *New York, Susquehanna and Western Railroad Co., supra; Young* v. *Hill, 4 Stew. Eq. 429.*

The ability of courts of equity to rectify mistakes arising from ignorance of the law is everywhere acknowledged to exist in certain instances. The propriety of exercising this power must depend upon the circumstances which surround each case. It will depend upon whether a party who asks relief has been negligent; whether he has been led into his belief by the other party; whether other innocent parties will be injured by a rectification of the mistake, or whether the mistake can be regarded as one of fact, although indirectly resulting from a mistaken notion of the law. All these and other features are to be considered in deciding whether it is equitable and politic to put the mistaken party in *statu quo.*

The cases in which the power has been exercised are collected and classified in *20 Am. & Eng. Encycl. L. (2d. ed.) 16.* In my judgment the power should be exercised in the present case. The mistake was in respect to the ownership of the property upon which the cancelled mortgage was an encumbrance, and the English cases treat such a mistake as one of fact.

Again, the annulment of the mortgage was without any consideration whatever. Nothing was received by the mortgagee and nothing was paid by the heirs.

The language of the supreme court of Maine (*Freemen* v. *Curtis, 51 Me. 140, 145*) in respect to the execution of a release induced by a mistaken notion of the rights of the releasor is pertinent. The court said: "There was nothing between the parties as a basis for any negotiation, and there was no claim of the one against the other, valid or invalid. It was an isolated act—the obtaining of a release of five-sixths of a valuable estate without any pretence of any consideration, through the ignorance of the parties giving it. Whether the defendant was ignorant or not, it would be a reproach to the law if he should now be permitted to retain the fruits of such a proceeding." In my judgment the heirs cannot, in the present case, equitably retain the advantage which the mistaken act of cancellation gave them.

It is said, however, that the complainant was negligent in not applying earlier for relief. It does not so appear. Nothing appears to show when it obtained its knowledge of the true condition of affairs. The complainant has been in possession since 1895. If negligence rested anywhere it would seem to be upon the parties who permitted the complainant to receive the rents and profits from the property up to the present time.

There should be the usual decree of foreclosure, with reference to a master to take an account of the rents and profits as a basis for ascertaining the amount due upon the mortgage.