# JUNE, 1910.

TEXAS & NEW ORLEANS RAILROAD COMPANY ET AL V. SABINE TRAM COMPANY.

Decided June 29, 1909.

**1.—Carriers—Goods for Export—Intrastate Shipment—Freight Tariff.**

A company engaged in exporting bought a bill of lumber from a lumber company in this State; by the terms of sale and purchase the lumber company was to deliver the lumber f. o. b. cars at a shipping port on the coast of this State this the lumber company did; upon arrival of the lumber at destination the railroad company, upon the contention that the lumber was intended for export, refused to deliver the same to the purchaser upon tender of the freight rate prescribed by the Railroad Commission of Texas for intrastate shipments between the two points, but demanded and finally collected the freight rate prescribed by the Interstate Commerce Commission for the transportation of lumber intended for export, which was much more than the rate fixed by the State Commission. In a suit by the lumber company against the railroads to

recover the difference between the two rates, held, the State and not the interstate rate applied, and the plaintiff was entitled to recover. The fact that the purchaser intended the lumber for export after it arrived at the port was immaterial so far as the seller was concerned.

**2.—Same—Overcharge for Freight—Right to Sue—Statute Construed.**

It was not intended by the provisions of art. 4568, Rev. Stats., that a shipper, made to pay an unlawful overcharge of freight by a railroad company should, first make complaint before the Railroad Commission of the State and secure a determination by it that said charge was unlawful, before he could sue the company for the overcharge.

**3.—Same—Penalties—Right to Sue.**

The fact that art. 4575, Rev. Stats., gives a right to sue a railroad company for a penalty for overcharge for freight, does not by implication prohibit a suit to recover as actual damages the excessive freight paid.

**4.—Same—Cumulative Penalties.**

A shipper is not limited to the recovery of only one penalty against a railroad company for overcharge of freight, but, under the provisions of art. 4581, Rev. Stats., concerning cummulative penalties, is entitled to recover in one suit for each separate violation of the law or each separate act of extortion as defined by art. 4573, and said statute is not in violation of sec. 13, art. 1 of the Constitution prohibiting the imposition of excessive fines, nor of the Fourteenth Amendment to the Constitution of the United States.

**5.—Same—Constitutional Law.**

Section 5 of the Act of 1891 (Rev. Stats. art. 4564) providing that the rates, charges, etc., prescribed by the Railroad Commission of Texas shall be deemed reasonable, fair and just, and shall not be controverted until found otherwise in a direct action brought for that purpose, is not violative of sec. 1 of the Fourteenth Amendment to the Constitution of the United States guarantying to every one the equal protection of the laws. Said Act in secs. 6 and 7 makes ample provision for determining whether such rates, charges, etc., are unreasonable or unjust.

**6.—Same—Mistake of Law, no Defense.**

It is no defense to a shipper's suit to recover from a railroad company an overcharge of freight or to recover the statutory penalties, that the company was innocently mistaken in its belief that under the facts it had a right to charge the interstate or export rate, and not the intrastate rate; under the statute (art. 4575) a railroad company is exempt from the prescribed penalties only when an overcharge was innocently and unintentionally made through a mistake of fact. A mistake as to the lawful rate is not a mistake of fact.

**7.—Same—Penalties—Separate Offenses.**

There were twenty-four separate shipments of lumber on as many different days, on each and all of which an overcharge of freight was made; the agent at destination allowed the expense bills to accumulate in his hands as the cars arrived, and during the period of the arrival of the cars only made five separate demands for the freight, collecting the freight on several cars at each time. Held, each of the twenty-four shipments constituted a separate and distinct offense for which the company was liable to pay the penalty. The fact that there were only five demands and five collections of the excessive freight was immaterial. Rev. Stats., arts. 4573-4575.

**8.—Appeal—Rendering Judgment—Agreement by Appeal—Practice.**

When, under a cross assignment by appellee, the appellate court decides that he is entitled to recover certain statutory penalties from a railroad, and the appellee agrees that in the event the court sustains his said assignment the court might render judgment for the minimum penalty fixed by law, the court will act on said agreement and render judgment accordingly, instead of remanding the cause for a jury to determine the amount of the penalty as between the maximum and minimum fixed by the statute.

Appeal from the District Court of Jefferson County, Texas. Tried below before Hon. L. B. Hightower, Jr.

*Baker, Botts, Parker & Garwood, Parker & Hefner,* and *Will E. Orgain,* for appellant, Texas & New Orleans Railroad Company.— *Glass, Estes & King,* for appellant, Texarkana & Fort Smith Railway Company.—Under the statutes of Texas a complaint of alleged over-charges, based on the demand and collection of a rate claimed to be unlawful and prohibited as being in excess of the rates fixed by the Railroad Commission of the State of Texas under authority of title 94, chapter 13, of the Revised Statutes of Texas, is one of which said Commission has the sole jurisdiction, at least, in the first instance, to investigate and determine whether there has in fact been a violation of its rates and, if so, the extent of the overcharge.

Since it appears from the face of plaintiff's petition that same is based upon the application of a single rate applied to freight shipped by plaintiff before the filing of its petition, all of such freight being of the same class shipped by the same parties, billed identically and transported by the same defendants, between the same points; and since it appears from plaintiff's allegations that each car and each shipment of such freight were subject to the same legally fixed rate, it follows inevitably that:

(a)   A single extortion was charged by plaintiff's petition, and

(b)   Only one penalty, of not less than $125, nor more than $500 could be recovered under such petition. Rev. Stats., art. 4573, defining extortion; Rev. Stats., art. 4575, fixing penalties for extortion; Gulledge v. Missouri Pac. Ry. Co., 3 Texas Civ. App., sec. 168; Griffin v. Interurban St. Ry. Co., 179 N. Y., 438; Fisher v. New York C. R. R., 46 N. Y., 644; Porter v. Dawson Bridge Co., 157 Pa. St., 367; Parks v. Nashville, C. & St. L. Ry. Co., 18 Am. & Eng. Ry. Cases, 404; id. 13 Lea, 1; Pittsburg, C. & St. L. Ry. Co. v. Moore, 33 Ohio, 384; McLean v. Interurban Ry Co., 92 N. Y. Supp., 77; In re Penalty Cases, 92 N. Y. Supp., 322.

Should the statute in question be construed to authorize the cumulation of penalties, it would then be void as in contravention of article 14 of the amendment to the Constitution of the United States, section 1, in that it would deny to the offending railway company due process of law and the equal protection of the laws, and would also be in violation of section 13, of article 1 of the Bill of Rights of the State of Texas, which prohibits the imposition of excessive fines, and prohibits the infliction of cruel or unusual punishment. Seection 1, article 14, of the amendments to the Constitution of the United States; section 13, article 1, Bill of Rights of the State of Texas; Cotting v. Kansas City Stock Yards, 183 U. S., 79; Consolidated Gas Company v. Meyer, 146 Fed., 150; ex parte Wood, 155 Fed., 190; State of Texas v. Galveston, H. & S. A. Ry. Co., 100 Texas, 153; Missouri, K. & T. Ry. Co. v. State of Texas, 97 S. W., 724.

Under the facts in this case the shipments, to which was applied the rate complained of, were foreign shipments and constituted a part of the foreign commerce of the country, and were therefore properly subjected to the rate established in compliance with the provisions of the

Interstate Commerce Acts enacted by the Congress of the United States in pursuance of authority given in the commerce clause of the Constitution of the United States. Constitution of the United States, art. 1, sec. 8, subdivision 3, 18; Act of Congress of U. S., entitled "The Act to Regulate Commerce," approved February 4, 1887, and amendments thereto, known as the Interstate Commerce Act, especially sec. 1 thereof; Houston D. N. Co. v. Insurance Co. of North America, 89 Texas, 1; State of Texas v. International & G. N. R. Co., 31 Texas Civ. App., 219; State of Texas v. Gulf, C. & S. F. Ry. Co., 44 S. W., 542; State of Texas v. Southern Kansas Ry Co., 49 S. W., 252; Gulf, C. & S. F. Ry. Co. v. Fort Grain Co., 72 S. W., 419; Gulf, W. T. & P. Ry. Co. v. Barry, 45 S. W., 814; The Daniel Ball, 10 Wallace (U. S.) 557; Texas & P. Ry. Co. v. Interstate Commerce Comm., 162 U. S., 197; Hanley v. Kansas City So. Ry. Co., 187 U. S., 617; Railroad Comm. of La. v. Texas & P. Ry. Co., 144 Fed., 68; Rosenbaum Grain Co. v. Chicago, R. I. & T. Ry. Co., 130 Fed., 46, 110; Globe Elev. Co. v. Andrew, 144 Fed., 871; Cutting v. Florida Ry. & Nav. Co., 46 Fed., 641; Cosmopolitan Ship. Co. v. Hamburg A. P. Co., 13 Interstate Commerce Comm. Rep., 266; Baer Bros. M. Co. v. Missouri Pac. Ry. Co., 13 Interstate Commerce Comm. Rep., 329; Eichenberg v. Southern Pac. Co., 14 Interstate Commerce Comm. Rep., 250; Leonard v. Kansas City So. Ry., 13 Interstate Commerce Comm. Rep., 573; United States v. Colorado & Northwestern Ry., 157 Fed., 321.

When, under the provisions of the Interstate Commerce Act, a carrier makes, publishes and files with the Interstate Commerce Commission tariffs applicable to certain movements of freight, the rate fixed by such tariffs is conclusively deemed to be the lawful rate, and any departure therefrom is prohibited by the Interstate Commerce Act. Interstate Commerce Act above referred to; sec. 1, Act of Feb. 19, 1903, commonly known as the Elkins Act; Texas & P. Ry. Co. v. Abilene Cotton Oil Company, 204 U. S., 447.

If, under the facts in this case, the rate fixed by the Railroad Commission of the State of Texas, under the laws of the State of Texas, was applicable to the shipments in question, and the rate established and filed with the Interstate Commerce Commission in obedience to the Interstate Commerce Act enacted by the Congress of the United States under authority of the commerce clause of the Constitution, was also applicable to the shipments in question, then there existed such a conflict that the carriers could not obey one statute without exposing themselves to the penalties prescribed by the other, and in such case the State law must yield, and the rate fixed in obedience to the Interstate Commerce Act must prevail. Constitution of United States, art. 1, sec. 8, subd. 3 and 18; Act to Regulate Commerce, approved Feb. 4, 1887, and amendments thereto, passed by Congress of U. S.; Cosmopolitan Ship. Co. v. Hamburg Am. P. Co., 13 Interstate Com. Rep., 266, and numerous decisions of the United States Supreme Court and Circuit Courts therein cited and discussed; United States v. Colorado & N. W. Ry. Co., 157 Fed., 329; Armour Pack. Co. v. United States, 153 Fed., 1; Texas & P. Ry. Co. v. Interstate Com. Comm., 162 U. S., 197.

*Greer, Minor & Miller,* for appellee.—In order for a shipment from a point in the State of Texas to another point in the State of Texas to become a part of a foreign shipment, and, therefore, subject to the jurisdiction of the Interstate Commerce Commission, the shipment in question must be a continuous one from the origin to a fixed foreign destination, and the freight shipped must have started, when it left the place of shipment, on its final continuous journey to a known, fixed foreign destination; and the provisions, means or arrangement for the freight to proceed to its foreign destination must have been made in the contract of shipment; that is, must arise out of and be found in the shipment made between the shipper and the carrier, so that no intervening contract, or act, or arrangement will be necessary to cause the lumber to move forward through the port on to its final foreign destination. Gulf, C. & S. F. Ry. Co. v. State of Texas, 204 U. S., 403, s. c. 97 Texas, 274; Coe v. Errol, 116 U. S., 524; Pennsylvania R. R. Co. v. Knight, 192 U. S., 27; Diamond Match Co. v. Ontonagon, 188 U. S., 94; Wabash, St. L. & P. Ry. Co. v. Illinois, 118 U. S., 572; Houston D. N. Co. v. Insurance Co. of North America, 89 Texas, 6; The Daniel Ball, 10 Wallace, 565.

The defendants are both and each liable for a penalty on every shipment on which it practiced extortion, for under the statute they are cumulative, and a claim, collection or suit for one penalty will not satisfy or bar a claim or suit for another and for a distinct extortion, though upon the same kind of a wrong. Arts. 4573, 4575, 4581, Rev. Stats. of Texas; San Antonio & A. P. Ry. Co. v. Stribling, 86 S. W., 374; s. c., 99 Texas, 319; Inman v. St. L. S. W. Ry. Co., 37 S. W., 37; Martin v. Johnson, 11 Texas Civ. App., 633; Missouri, K. & T. Ry. Co. v. State, 97 S. W., 724; in re Snow, 120 U. S., 286; State v. Ilinois So. Ry. Co., 18 L. R. A., 503; Southern Ry. Co. v. State, 75 N. E., 276; Murray v. Gulf, C. & S. F. Ry. Co., 63 Texas, 411; Pittsburg, C. & St. L. Ry. Co. v. Moore, 33 Ohio St., 393.

REESE, Asssociate Justice.—This is a suit instituted by the Sabine Tram Company, a lumber manufacturing corporation, against the Texas & New Orleans Railroad Company and the Texarkana & Fort Smith Railway Company to recover excessive freight charges on shipments of lumber by plaintiffs over the lines of railway of defendants, and, in addition, statutory penalties for such overcharge.

It was alleged in the petition that at various times from September 1 to November 1, 1906, plaintiff, the Sabine Tram Company, shipped from Ruliff, Texas, a station on the line of the Texarkana & Fort Smith Railway Company, to Sabine, Texas, on the line of the Texas & New Orleans Railroad Company, over the lines of said roads, certain carloads of lumber consigned to the said Sabine Tram Company, "Notify W. A. Powell Company;" that the lumber was received by the Texarkana & Fort Smith Railway Company and by it carried to Beaumont, Texas, at which point it was turned over to the connecting carrier, the Texas & New Orleans Railroad Company, and by it carried to destination at Sabine, Texas, and there delivered to plaintiff's order. It was alleged that the rate of freight established by the

Railroad Commission of Texas for carriage of said lumber was, from Ruliff to Beaumont, four cents per hundred pounds, and from Beaumont to Sabine two and one-half cents per hundred pounds, the rate so established being from Ruliff to Sabine the sum of such two rates, or six and one-half cents per hundred pounds. That the Texas & New Orleans Railroad Company, the terminal carrier, on the arrival of said lumber at Sabine demanded for itself and the Texarkana & Fort Smith Company, acting for the latter company as well as for itself, fifteen cents per hundred pounds, which was paid by plaintiff under protest. The overcharge sought to be recovered was alleged to be $1,788.33, and in addition plaintiff sought to recover the maximum penalty of $500 provided by statute upon each carload of said lumber.

Defendant set up by way of defense that the carriage of the lumber from Ruliff to Sabine was in the way of transportation of the same to points beyond the limits of the United States, or foreign shipments, and the same came under the provisions of the Interstate Commerce Laws of the United States, and was not subject to rates prescribed by the Texas Railway Commission or the laws of Texas; and further, that the fifteen cents per hundred pounds charged and collected as freight was the proper freight charge in accordance with schedule of freight charges filed by said railroad companies respectively with the Interstate Commerce Commission, to which said shipments were subject. Other matters were set up by way of defense which need not be here specifically set out.

The substantial defense of defendants is that the shipment from Ruliff to Sabine was a foreign shipment within the purview of the Constitution and laws of the United States.

The trial court instructed the jury that the shipments of lumber in question were subject to the freight rates prescribed by the Railroad Commission of Texas, and that plaintiffs were entitled to recover the excessive charges as claimed. As to the penalties sued for, the jury was instructed that plaintiff was entitled to recover under the statute for five separate penalties of not less than $125 nor more than $500 each, that is, that it was entitled to recover in penalties not less than $625 nor more than $2500 in the discretion of the jury.

Under this charge the jury returned a verdict for plaintiff against both defendants jointly for $1788.33 overcharge of freight, and $1785 penalties, upon which judgment was rendered. From the judgment, their motion for a new trial having been overruled, defendants prosecute this appeal.

There seems to be no dispute as to the material facts with the single exception of the amount of the Texas Commission rate applicable to the shipments, if they be subject to such rate. The evidence establishes the following facts:

At the date of the transaction in question the Sabine Tram Company was engaged in the manufacture of lumber at its mill at Ruliff, a station in Texas on the line of the Texarkana & Fort Smith Railway Company. W. A. Powell Company, Limited, was engaged in buying lumber for export to different points in Europe through the ports of Sabine and Port Arthur, both in the State of Texas. On August 28, 1906, having made sales to customers for future de-

livery in Europe of large amounts of heavy pine lumber, for the carriage of which steamships had in part already been chartered, to fill such contracts, W. A. Powell Co. bought of the Sabine Tram Company 500,000 feet of heavy pine lumber of certain dimensions, to be delivered during the months of September and October. The contract provided for delivery either in the water at Orange, Texas, or f. o. b. cars at Sabine, Texas, at the option of the seller. The seller exercised the option to deliver at Sabine, a station on the line of the Texas & New Orleans Railway. During the months of September and October the lumber purchased was delivered to the Texarkana & Fort Smith Railroad at Ruliff, to be by it transported to Beaumont, the terminus of its line, and thence by connecting carrier, the Texas & New Orleans Railway, to Sabine and delivery to the Sabine Tram Company. There were twenty-four several shipments of the lumber on as many different days, the shipments embracing thirty-three cars, for which thirty separate bills of lading were executed by the Texarkana & Fort Smith road, for delivery at Sabine to Sabine Tram Company, "Notify W. A. Powell Company, Limited." No other contract or arrangement was made by the Sabine Tram Company for the carriage of the lumber except that evidenced by the bills of lading aforesaid. Waybills accompanied the shipments upon which were marked in pencil "for export," but the Sabine Tram had no connection with or knowledge of the making of these waybills, which was the act of the railway company alone. According to the course of dealing between the parties these bills of lading were endorsed by the Tram Company and sent through a bank to W. A. Powell Company, Limited, at New Orleans, La., attached to a draft for the price of the lumber, which being paid, the bills were delivered to Powell Company and by them transmitted to their agent, Flanagan, at Sabine. In case of most of the shipments in question the bills of lading reached Flanagan at Sabine before the arrival of the lumber for which they were given. The lumber was carried, under the shipping contracts or bills of lading aforesaid, by the Texarkana & Fort Smith road to Beaumont, and there delivered to the Texas & New Orleans road, by which it was carried to Sabine. Upon arrival at the station of Sabine it was, by direction of the agent of Powell Company, carried without delay about a quarter of a mile beyond the station to the dock, where the lumber was to be unloaded. The lumber was unloaded from the cars into the water of the slip in reach of ship's tackle, ready for loading into the ships. The Sabine Tram Company had no connection with this further carriage or switching of the lumber to the docks after its arrival at the station of Sabine, but this was done solely at the instance and under the direction of the agent of Powell Company. The transportation from Ruliff to Sabine was entirely within the State of Texas.

The rate established by the Railroad Commission of Texas for transportation of lumber from Ruliff to Beaumont was four cents per hundred pounds, and from Beaumont to Sabine was two and one-half cents per hundred pounds, and by order regularly made by the said Commission it was provided that the through rate should not be more than the sum of the locals, under which order the through rate demandable from Ruliff to Sabine was six and one-half cents per hun-

dred pounds, the orders of said Commission further providing for a switching charge of $1.50 per car from Sabine station to the docks.

According to a schedule of freight tariffs filed by the Texarkana & Fort Smith Railway Company with the Interstate Commerce Commission, the freight charge on lumber for interstate or foreign transportation from Ruliff to Beaumont was ten cents per hundred pounds, and according to like schedule of freight tariffs filed by the Texas & New Orleans Railroad Company with the Interstate Commerce Commission, from Beaumont to Sabine was five cents per hundred pounds. When these tariffs were so filed is immaterial, except upon the issue of good faith on the part of defendants, as the plaintiff in any event, regardless of the interstate rate, would not be entitled to recover in this suit if the Texas Commission rate was not applicable, which would only be the case if the shipment be regarded as an intrastate and not a foreign or interstate shipment, which is the fundamental issue. We find, however, that the rate under the Act of Congress relating thereto, from Ruliff to Sabine was fifteen cents per hundred pounds.

When the lumber had been switched to the docks, W. A. Powell Company, through their agent, presented the bills of lading, and demanded the lumber, offering to pay the freight charges, which, according to the course of dealing between the parties, they were to pay for the Sabine Tram Company who owed the same, and which it was to repay to Powell Company. The Texas & New Orleans Company, acting for itself and the Texarkana & Fort Smith Company, demanded the Interstate Commission rate of fifteen cents per hundred pounds, having been previously instructed by the Texarkana & Fort Smith Company that ten cents per hundred pounds was its rate from Ruliff to Beaumont. This the Powell Company, under instructions of the Sabine Tram Company, at first refused to pay, but after communicating with the Tram Company, finally paid the freight at this rate under protest, in order to get possession of the lumber.

For switching from Sabine to the docks, the rules and orders of the Texas Railroad Commission would allow a switching charge of $1.50 per car on domestic shipments, and if foreign or interstate shipments, the Interstate Commerce Commission tariffs would allow a switching charge of $2.50 per car, had not the charge for this service been absorbed in the 15-cent rate established aforesaid.

Upon shipment of freight not for export, only forty-eight hours' free time was allowed for unloading cars, after which demurrage was charged, and if not removed from railroad premises when unloaded, a storage charge was made in addition. No such charge was made upon any of the lumber involved in this suit.

W. A. Powell Company, Limited, regarded the shipments in controversy as export shipments, and demanded, expected, and received, the use of terminal facilities, additional free time, and other privileges accorded to shippers of export freight under export tariffs. The railway company knew, when the freight charges were collected, that the lumber was to be placed in its slips and exported to Europe on incoming ships, and the freight was believed by the officers and agents of the railroad company at the time the charges were collected, to constitute foreign commerce and to both permit and require the appli-

cation of the rate fixed by the tariff on file with the Interstate Commerce Commission, and his rate was applied.

All the lumber in question was in fact unloaded from the cars by W. A. Powell Company, Limited, into the Texas & New Orleans Railroad Company's slips, or upon its docks, in reach of ship's tackle, and loaded into the ships previously chartered for the purpose by W. A. Powell Company, Limited, which steamships carried same thence direct to Europe, where this lumber was applied upon contracts for sale in Europe made before the lumber began to leave Ruliff, and made in fact before the lumber was purchased from the Sabine Tram Company, and before it was sawed, and before the logs from which it was sawed left the State of Louisiana for the Sabine Tram Company's mill at Ruliff, in the State of Texas. One of the ships actually waited at the docks at Sabine for the arrival of part of the lumber which constituted a portion of its cargo.

The ship which carried the last of this lumber from Sabine to Europe was chartered by W. A. Powell Company, Limited, for this purpose after these lumber shipments began to arrive at Sabine, but before all of the shipments had left Ruliff.

None of this lumber remained in the slip at Sabine, or on the docks, except for the time necessary to await the arrival of the particular ship which had previously been chartered for the purpose and designated by W. A. Powell Company as the ship which was to carry that particular lumber from the port of Sabine to Europe.

Any shipment of lumber intended for export to Europe, and in fact shipped from any point in Texas, to and through Sabine as its port of transhipment, could be contracted for, billed to and from Sabine, shipped, transported, and handled in every particular just as was this lumber.

W. A. Powell Company, Limited, before this lumber began to arrive at Sabine, took out a blanket policy of insurance, protecting same against loss, from the time this lumber should come into the possession of W. A. Powell Company, Limited, at Sabine, until its final delivery by W. A. Powell Company, Limited, in European ports.

At the time this lumber was shipped it was destined by Powell Company for export to some foreign port, but the particular destination of any particular portion of the lumber was not fixed, although the destination of all of the lumber to certain foreign ports was known and fixed. The Sabine Tram Company had no concern with the destination of the lumber after it came into the hands of Powell Company, and had no particular knowledge thereof. It supposed from the fact that it was known that Powell Company were exporters of lumber, from the character of lumber which was such as was intended for export, from the fact that Sabine was an unimportant place at which very little lumber was used, and from other facts and circumstances known to millmen generally, that the lumber was intended for export, but gave that matter no concern, being only concerned with the delivery of the lumber to Powell Company at Sabine station, and paying the freight thereon. What was done by the Texas & New Orleans Railroad Company after the arrival of the lumber at Sabine, in the way of switching to the docks, allowance of certain privileges

allowed only to export freight, was done at the instance and for the benefit of Powell Company, with which the Tram Company had no concern.

The difference between the amount demanded and received by the Texas & New Orleans Railroad Company for itself and the Texarkana & Fort Smith Railway Company, and the Texas Commission rate was, as found by the jury, $1,788.33. As stated before, there were thirty-three cars of the lumber, for which thirty separate bills of lading were executed, some of the timbers requiring, on account of their length, two cars, which accounts for the difference between the number of cars and the number of the bills of lading. The shipments were made at twenty-four different times, that is, on twenty-four different days. The agent of the Texas & New Orleans Company at Sabine did not make separate demands upon each expense bill, but allowed them to accumulate, in which way it occurred that only five separate demands for freight were made at different dates, the five demands covering the entire freight. From this the trial court arrived at the conclusion that the defendants had incurred liability for five separate statutory penalties, of not less than $125 and not more than $500, that is, not less than $625 and not more than $2,500, which was the sole issue submitted to the jury.

Upon the freight bills was a charge for wharfage against the Tram Company which was paid by Powell Company as a proper charge against them and not against the Tram Company. Export freight was entitled to seven days' free time for unloading, and thirty days free storage on the docks or in the slips, which privileges were availed of by Powell Company in handling this lumber.

The freight bills were made out against the Sabine Tram Company, and defendants knew that Powell Company were paying the freight for the Tram Company.

The defendants, in charging the export rate, acted under the advice of their attorneys that the facts constituted the lumber an export shipment and subjected it to the Interstate Commerce Commission rate.

While there are other incidental questions presented, the fundamental question involved in this appeal is whether the shipment of the lumber was a transaction falling under the definition of foreign commerce. If it was, then under the express provisions of the Act establishing the Railroad Commission of Texas and prescribing its duties and authority, neither the rate fixed by such Commission nor the provisions of the statute, upon which alone the claim of plaintiff rests, have any application and its suit must fail. Art. 4280-(1).

Without pretending to discuss seriatim the several assignments of error and the propositions thereunder, we will dispose of the several questions which are therein presented.

In the view we take of the opinion of the Supreme Court of this State in the case of Gulf C. & S. F. Ry. Co. v. State of Texas (97 Texas, 274) and of the Supreme Court of the United States in the same case (204 U. S., 403) in their application to the questions here involved, we are relieved of the necessity of a discussion of other cases either of our own Supreme Court or of the United States Supreme Court—the ultimate authority in the decision of such questions—upon

the question involved, as it is presented by the record. Nor are we concerned with what may appear to be a conflict between the views there expressed and earlier decisions of either of said courts. We would feel compelled, in fact, to follow decision of our own Supreme Court, unless such decision had been overruled by some later decision of the tribunal of last resort in such cases, upon the point involved. Inasmuch, however, as the Federal Supreme Court fully approved the decision of the Supreme Court of Texas in the case cited, and as we have referred to no later decision by the Federal Supreme Court which, in our judgment, tends to impeach the doctrine there laid down, it only remains to determine whether, upon the facts of the case of Gulf C. & S. F. Ry. Co. v. State, *supra,* the rule of decision there announced is applicable to the facts of the present case.

The question in that case was whether the movement of the two cars of grain from Texarkana in Texas to Goldthwaite, another point in Texas, was such a part of a continuous movement from Hudson, South Dakota, (or, more properly from Kansas City, Missouri,) as to constitute the former shipment an interstate shipment.

If the grain had been bought by the Hardin Grain Company of the Harroun Commission Company at Goldthwaite, for delivery to the Hardin Grain Company at Texarkana, the latter intending the grain for its purchaser at Kansas City, and immediately upon its delivery to them continuing the shipment to Kansas City with only such interruption as would be necessary to transfer the grain to another carrier for transportation under a new and different contract of shipment or bill of lading to its customer at Kansas City, there would be an exact parallel between the facts of that case and of this. That it made no difference, in determining whether the movement between Texarkana to Goldthwaite was an interstate movement, whether it was from Kansas City to Texarkana, an interstate movement, thence to Goldthwaite in the same State, or from Goldthwaite to Texarkana, both in Texas, thence to Kansas City, outside of the State, is shown by the following quotation from the opinion of the Supreme Court of the United States in the cited case:

"The same question may be looked at from another point of view. Supposing a car load of goods was shipped from Goldthwaite to Texarkana under a bill of lading calling for only that transportation, and supposing that the laws of Texas required, subject to penalty, that such goods should be carried in a particular kind of car, can there be any doubt that the carrier would be subject to the penalty although it should appear that the shipper intended after the goods had reached Texarkana to forward them to some other place outside the State? To state the question in other words, if the only contract of shipment was for local transportation, would the State law in respect to the mode of transportation be set aside by a Federal law in respect to interstate transportation on the ground that the shipper intended, after the one contract of shipment had been completed, to forward the goods to some place outside the State? Coe v. Errol, 116 U. S., 517."

It will be noticed that the court puts the case of the owner and shipper himself shipping the goods upon a bill of lading calling for transportation from one point to another in the same State, intending

himself to forward them from such point to some point without the State, in this respect going further, probably, than the Supreme Court of Texas. The case is very much stronger here against the view that the movement to Sabine was a foreign shipment, in that the further movement of the lumber after reaching Sabine was a matter with which the shipper, the Sabine Tram Company, had nothing whatever to do, and which was never, at any time, in its mind, except as a surmise or general idea that Powell Company intended the lumber for foreign shipment after delivery to them and after it became their property, upon payment for the same and delivery of the bills of lading. We make no excuse for the following extended quotation from the opinion of Justice Brewer, speaking for the United States Supreme Court in the Santa Fe Railway Company case, as what is said is so apt in its application to the facts of the present case:

"It is undoubtedly true that the character of a shipment, whether local or interstate, is not changed by a transfer of title during the transportation. But whether it be one or the other may depend on the contract of shipment. The rights and obligations of carriers and shippers are reciprocal. The first contract of shipment in this case was from Hudson to Texarkana. During that transportation a contract was made at Kansas City for the sale of the corn, but that did not affect the character of the shipment from Hudson to Texarkana. It was an interstate shipment after the contract of sale as well as before. In other words, the transportation which was contracted for, and which was not changed by any act of the parties, was transportation of the corn from Hudson to Texarkana—that is, an interstate shipment. The control over goods in process of transportation, which may be repeatedly changed by sale, is one thing; the transportation is another thing, and follows the contract of shipment until that is changed by the agreement of owner and carrier. Neither Harroun nor the Hardin company changed or offered to change the contract of shipment or the place of delivery. The Hardin Company accepted the contract of shipment heretofore made and accepted the corn to be delivered at Texarkana, that is, on the completion of the existing contract. When the Hardin Company accepted the corn at Texarkana, the transportation contracted for ended. The carrier was under no obligations to carry it further. It transferred the corn, in obedience to the demands of the owner, to the Texas & Pacific Railway Company to be delivered by it, under the contract with said owner. Whatever obligations may rest upon the carrier at the terminus of its transportation to deliver to some further carrier in obedience to the instructions of the owner, it is acting not as a carrier, but simply as a forwarder. No new arrangement having been made for the transportation, the corn was delivered to the Hardin Company at Texarkana. Whatever may have been the thought or purpose of the Hardin Company in respect to the further disposition of the corn, was a matter immaterial so far as the completed transportation was concerned.

"In this respect there is no difference between an interstate passenger and an interstate transportation. If Hardin, for instance, had purchased at Hudson a ticket for interstate carriage to Texarkana,

intending all the while after he reached Texarkana to go on to Gold-thwaite, he would not be entitled on his arrival at Texarkana to a new ticket from Texarkana to Goldthwaite at the proportionate fraction of the rate prescribed by the Interstate Commerce Commission for carriage from Hudson to Goldthwaite. The one contract of the railroad companies having been finished, he must make a new contract for his carriage to Goldthwaite, and that must be subject to the law of the State within which that carriage was to be made."

The facts of the Santa Fe Railway Company case are thus succinctly stated by the Supreme Court of Texas:

"The substance of the facts as found by the trial court and the Court of Civil Appeals seems to us to be these: The Hardin Grain Company, doing business in Kansas City, Missouri, having made a contract with parties at Goldthwaite, Texas, for the delivery of two car loads of corn at that place, in order to comply with their undertaking contracted to purchase of Harroun Commission Company, who were also doing business at Kansas City, Missouri, and had an agent at Texarkana, Texas, the same quality of corn, to be delivered at the point last named; that the corn with which the Harroun Commission Company proposed to fulfill their contract was shipped from South Dakota to Texarkana, Texas, through Kansas City, Missouri; that while it was in transit at the latter place the Harroun Commission Company became apprised of the fact; that the corn was delivered at Texarkana, Texas, in accordance with the agreement, to the Hardin Grain Company, who thereupon shipped it in the same cars, without breaking bulk, over the Texas & Pacific Railway and its connecting lines to Goldthwaite, Texas."

And upon these facts, in disposing of the question of whether they constituted interstate shipment, the court says:

"Here the Harroun Commission Company, the original consignors, were the owners of the corn when shipped and until its arrival at Texarkana and delivery there to the Hardin Grain Company in compliance with their contract of sale. They neither intended nor contemplated any shipment beyond the point to which it was consigned. When the corn was delivered to them at Texarkana, the contract on the part of the carriers was performed and the carriage so far was at an end. Even had they known that the buyers intended to have the corn transported to a further point in Texas, we fail to see that it would have altered the case. Having ceased to be the owners of the corn upon its delivery to the Hardin Grain Company at Texarkana, as contemplated in their contract, they had no further control over it nor had they any further concern with it."

As said by the Supreme Court of the United States in its opinion, it made no difference that the title to the property was transferred during the course of the transportation. That fact did not affect the character of the movement as evidenced by the terms of the shipping contract. As a reason for holding that the contract of shipment alone was to be looked to, in determining the character of the transportation, Justice Brewer says:

"It must be further remembered that no bill of lading was issued from Texarkana to Goldthwaite until after the arrival of the corn at

Texarkana, the completion of the first contract for transportation, the acceptance and payment by the Hardin Company. In many cases it would work the grossest injustice to a carrier if it could not rely on the contract of shipment it has made, know whether it was bound to obey the State or Federal law, or, obeying the former, find itself mulcted in penalties for not obeying the law of the other jurisdiction, simply because the shipper intended a transportation beyond that specified in the contract. It must be remembered that there is no presumption that a transportation, when commenced, is to be continued beyond the State limits, and the carrier ought to be able to depend upon the contract which it has made and must conform to the liability imposed by that contract."

And this applies with much more force to the facts of the present case, where it is sought by appellants to determine the character of the shipment, not by the intentions of the shipper and the owners of the lumber, but by the intentions of the consignee, who in fact had nothing to do with the shipping contract when made. This does not, to any extent, affect the doctrine announced in Coe v. Errol (116 U. S., 517) that goods become the subject of interstate commerce and pass beyond the jurisdiction of the State when they have been shipped or entered with a common carrier for transportation to another State, or have been started upon such transportation in a continuous route or journey. The effect of this is that the grain did not begin its journey to Goldthwaite until delivery to the carrier at Texarkana for carriage to that point, as in the present case, the lumber did not begin its journey to a foreign port until the carriage from Ruliff to Sabine had terminated.

To us it seems utterly unreasonable to hold that the character of this shipment of lumber by the owner from one point in Texas to another point in the same State, there to be delivered to its own order, under a shipping contract which was completely performed by delivery at the point of destination under the shipper's contract, should be determined by the intention of the consignee as to its future disposition. If allowing the terms of a shipping contract in a case of this kind to determine whether the transportation shall come under the protection of the laws of Congress as interstate commerce, would place it in the power of the owner of property to control this matter, we must confess that we can see no harm in this, nor any violation of the spirit or purpose of the provision of the Federal Constitution reserving to Congress the power to regulate commerce between the States and with foreign nations, and the laws passed in pursuance thereof.

Nor do we think that this case can be distinguished from the Santa Fe Railway Company case on the ground that that case involved the question of an interstate or intrastate shipment, while this involves the question of a foreign or intrastate shipment. The difference between the authority of the Interstate Commerce Commission over interstate traffic and foreign traffic in that it has control only over such foreign traffic to and from the port, and not over the ocean carriage, does not at all affect the applicability of the doctrine announced in this case, which must be governed by the same rules as if the lumber were

intended by Powell Company for shipment to another State, instead of to a foreign country not adjacent to the United States.

We conclude that the trial court rightly held that upon the undisputed evidence the shipment was an intrastate shipment, and governed by the rates prescribed by the Railroad Commission of Texas.

Appellants presented a plea in abatement to the effect, in substance, that under the provisions of article 4568, Revised Statutes, complaint must first be made to the Railroad Commission of Texas of such violation of law as is here complained of, and that there must first be a determination by the Commission that the rate charged is in violation of law before suit can be instituted in the courts to recover for such violation. Appellee excepted to such plea, and the court sustained the exception and overruled the plea, and the ruling is assigned as error. There is no merit in the assignments and they are overruled.

If it had been intended by the Legislature that complaint must first be made to the Commission before suit could be instituted in the courts to recover overcharges for freight, we think such intention would have been more clearly expressed than is done in this article of the statute which merely provides that such complaint *may* be made to the Commission. It is provided by the statute that if upon hearing of such complaint it is found that there has been a violation of the law, the Commission shall first determine if the same was wilful. If not wilful, the offending company shall be called upon to satisfy the damage done to the complainant. If this is not done, or if the violation is found to be wilful, the Commission shall institute proceedings to colect the statutory penalties due to the State, which are separate and distinct from those allowed the complainant. It is further provided that this procedure shall not abridge nor affect the right of any person to sue for any penalty that may be due any person under the provisions of law. Article 4575, Revised Statutes, under which this suit is brought, authorizes suits by any person injured for his damages and also for the penalties provided. We can not agree with appellants that by the express provisions of the latter part of article 4575, saving the right to sue for penalties, it was intended to limit the right thus reserved to sue for statutory penalties and, by implication, to prohibit suits for recovery of the actual damages. No express provision of the statute is necessary to give to the person injured by a violation of the law the right to sue for and recover his actual damages for the injury, and it was probably not thought necessary to reserve such right, or to provide specially that it should not be abridged by the provisions of article 4568, with regard to a hearing before the Railroad Commission. It would be most unreasonable to require an injured person to first apply to the Commission before suing for his actual damages, but to leave him free to sue for the statutory penalties, and such was not the intention of the Legislature.

Under the provisions of the statute appellee was not limited to the recovery of one single penalty, but was, we think, under article 4581, with regard to cumulative penalties, entitled to recover for each separate violation of the law, or each separate act of extortion as defined

by article 4573. In view of article 4581, which was intended to provide expressly for the cumulation of penalties for separate violations of the law, the authorities cited by appellants in support of their proposition under the fourth, fifth and sixth assignments of error have no application. As each act of extortion is distinct and complete in itself, for which the statute provides a penalty and gives a right of action for the recovery thereof, where there is more than one such act to the injury of any person, recovery may be had in one suit for the penalty provided for each act. Nor would such construction of the act render it violative of section 13, article 1 of the Constitution of the State prohibiting the imposition of excessive fines. (State of Texas v. Laredo Ice Co., 96 Texas, 461.) Such a construction of the statute does not violate the provisions of the fourteenth amendment to the Constitution of the United States, that no person shall be deprived of his property without due process of law, nor be denied the equal protection of the law.

Appellants by their answer alleged as defense that the rate prescribed by the Railroad Commission was unreasonably low and insufficient to afford them reasonable compensation for the services performed and required, and was confiscatory that section 5 of the Act of 1891 (article 4564 Revised Statutes) properly construed, was not intended to abridge their right to make such defense in this suit, but if it be so construed, then it was violative of section 1 of the Fourteenth Amendment of the Constitution of the United States in that thereby appellants were denied the equal protection of the laws. The section of the Act referred to is as follows, and is set out in full in the answer:

"In all actions between private parties and railway companies brought under this law, the rates, charges, rules, orders, regulations and classifications prescribed by said Commission, before the institution of such action, shall be held conclusive and deemed and accepted to be reasonable, fair and just, and in such respects shall not be controverted therein until finally found otherwise in a direct action brought for that purpose in the manner prescribed by sections 6 and 7 hereof."

It seems clear that the Act referred to was expressly intended to apply to such a case as is presented by this petition. Its purpose is clear and unmistakable. Careful provision is made by sections 6 and 7 of the Act (arts. 4565, 4566, Revised Statutes) for the institution and speedy trial and final disposition of actions against the Railroad Commission by any railroad company or other party at interest who may be dissatisfied with any rate, classification, rule, charge, order, act or regulation adopted by the Commission, to determine whether the same is unreasonable or unjust. In this way a uniform rule is established, binding upon the railroad company and shipper alike, and it was not open to either the shipper or the railroad company to say that any rate, rule, classification or regulation adopted by the Commission was unjust or unreasonable until it was so declared in such a proceeding against the Railroad Commission. But it must be borne in mind that a direct and appropriate proceeding was provided in the courts of the country through which this question might be deter-

mined after full hearing of all parties, and in this the statute in question is vitally different from that held unconstitutional in Chicago, M. & St. P. Ry. v. Minnesota (134 U. S., 418). We are unable to conceive in what way this statute can be said to deprive appellants of the equal protection of the law.

There is no logical ground, so far as the application of the statute is concerned, to distinguish a rate which is unreasonable because it does not, after paying the expense of the service, afford at least some profit on the investment, to which the railroad companies are entitled, and a rate which is unreasonable and unjust in that it does not return to the carrier the actual cost of the service, and which is on that account, as stated by appellants, confiscatory; between a rate which barely returns the actual cost of the service, and a rate which returns less than that. A rate is unjust and unreasonable in the one case as well as in the other. There is only a difference in the degree of unreasonableness. An infinitesimal fraction of a cent might determine whether a rate was simply unreasonable, or so unreasonable as to be what appellants term confiscatory.

It is no defense to appellee's claim either for the overcharge or the statutory penalties that appellants may have been innocently mistaken as to their belief that under the facts existing with regard to this shipment they had a right to charge the interstate or export rate. To allow such a defense would practically nullify the statute. The statute (art. 4575) provides that the railroad company shall not be liable for the penalties therein provided if it is shown that the overcharge was unintentionally and innocently made through a mistake of fact. The overcharges here complained of were not so made. Every material fact with regard to these shipments which could affect or determine their character as intrastate or export were as well known to appellants at the time the overcharges were made as they are now. There was no substantial dispute upon the trial as to these facts, and appellants justify the charges made upon the existence of these facts. Whether they constituted an export shipment or an intrastate shipment was purely a question of law, not even a mixed question of law and fact. As to this question of law the appellants were mistaken. It is probably a harsh rule which makes them liable for heavy penalties imposed, not for compensation, but for punishment, if they acted under such excusable mistake even of the law, but it is so written and we know of no rule of judicial action which would authorize us to set aside the plain provision of the statute to avoid what may be the harsh consequences of its enforcement in the particular case. Courts of equity have sometimes relieved parties of the consequences of a mistake of law sometimes under the thin disguise of declaring it a mixed question of law or fact, and sometimes without even this disguise. (Swedesboro Building & Loan Asso. v. Gans et al., 55 Atl., 82; Ramsey v. Allison, 64 Texas, 703; Moreland v. Atchison, 19 Texas, 309.) But there is no room for the exercise of this equity jurisdiction of the court in the matter of the enforcement of the plain provisions of this statute, which expressly provides that for a mistake

of fact appellants may be relieved of the penalties, and impliedly that for a mistake of law they shall· not be.

Appellants exaggerate, we think, the danger they were in of being mulcted in penalties for violation of the Interstate Commerce Act of Congress if they had charged the. State Commission rate. That article, it is true, prescribes a heavy penalty for charging more or less than the rate filed with the Interstate Commerce Commission, but only when such violation is wilfull, which it could not have been held to be in this case. That seems to us to be the more just and reasonable rule, but the Legislature has thought proper to enforce the penalties in all cases of overcharge except when made under a mistake of fact, whether or not done under such circumstances as would render the act wilful.

It appears that the agent of appellant, the Texas & New Orleans Railroad Company, at Sabine had allowed expense bills to accumulate in his hands, instead of making his demand and collecting the freight charges on each, and in this way on five several occasions he had demanded and collected such charges on the expense bills in his hands. The trial court concluded, as a matter of law, that this rendered appellants liable for five several penalties only under the law, and so instructed the jury. Appellee contends that each shipment, of which there were twenty-four on as many several days, constituted a separate and distinct offense under articles 4573-4575, for which appellants were liable, and requested a special charge to that effect, which was refused. The correctness of this action of the court is presented by an appropriate cross-assignment of ˙error by appellee. We agree with appellee as to this contention and that under the undisputed evidence appellants are liable for penalties of not less than $125 nor more than $500 upon each of the twenty-four separate shipments. This would ordinarily require a reversal of the judgment and that the cause be remanded upon appellee's cross-assignment of error in order that it might be determined in the trial court what amount of penalties, as between the maximum and minimum, should be recovered. But appellee àgrees that, in the event their cross-assignment of error be sustained, this court may render judgment for the minimum penalty in each case. Inasmuch as, under our view of the law, we would be required to remand the cause with instructions to determine what amount should be adjudged to appellee for the twenty-four violations of the law under which appellants could not be adjudged liable for less than $125 for each of the twenty-four infractions of the law, for which appellee agrees that we may render judgment instead of remanding the cause, the judgment will be reformed on appellee's cross-assignment and here rendered in appellee's favor against appellants for $1788.33, being the amount of the overcharges, and in addition for a penalty of $125 for each of the twenty-four separate shipments, aggregating $3,000.

We have carefully examined each of the several assignments of error presented by appellants and the several propositions thereunder, and, while each of them has not been discussed in this. opinion, our conclusion is that none of them present any ground for reversing the judgment, and they are severally overruled.

The judgment is reformed and affirmed as herein indicated.

We are requested by both parties to correct our findings of fact in some particulars, and for additional findings, and in deference to such request we desire to correct the findings made and to make additional findings in what we regard, however, as unimportant and immaterial particulars, in no way affecting any of the questions presented and decided on this appeal. We find as follows:

Powell & Company purchased lumber from other mills in Texas, with which to supply its said sales in part; it did not know when any particular car or stick of lumber left Ruliff; into which ship or to what particular destination it would ultimately go; or on which sale it would be applied, this not being found out until its agent, Flannagan, inspected the invoice mailed to and received by him after shipment. Upon inspection of the invoice, he determined from the character of the lumber described whether it was suited for one cargo or the other. The lumber remained, after arrival, in the slips or on the dock from one to thirty days until a ship chartered by Powell & Company arrived, when that Company selected out the lumber suited for that cargo, and shipped it forward to the destination for which Powell & Company intended it.

We withdraw our findings that the rules and orders of the Texas Railroad Commission would allow a switching charge of $1.50 per car on domestic shipments. The only testimony we can find on this point is that of the witness Beard, General Freight Agent of the Texas & New Orleans Railroad Company, that "the Texas rate for switching these cars would have been $1.50 per car, that is, if Powell Company owned the docks; if it was shipped to the warehouse owned by consignees or his place of business." This testimony does not authorize the general finding on this point made by us.

The freight rate due under the tariff on file with the Interstate Commerce Commission and collected on these shipments was fifteen cents per hundred pounds, and under this rate, the services rendered without other charge included switching from Sabine station to the docks, seven days free time exclusive of Sundays within which to unload the lumber from the car, and thirty days free storage of the lumber upon the docks at the wharves or in the slips belonging to the Texas & New Orleans Railroad Company. W. A. Powell & Company, Lit., availed itself of all these services and privileges which were stipulated for by the Interstate Commerce Commission tariff and included in the fifteen cent rate charged on export freight.

There is not now and was not at the time these shipments moved, any local market for lumber at Sabine, the population of which place does not exceed fifty in number. Appellees have never done any local business at that point. For the year 1905 there was exported through the port of Sabine 14,667,670 feet of lumber; for the year 1906, 39,554,000 feet. The shipments in controversy, together with other shipments of lumber to Sabine and Sabine Pass, constitute a large

and constantly recurring course of foreign commerce passing out through the port of Sabine. The motion for rehearing is overruled.

*Reformed and affirmed.*

Writ of error refused.